May it please the court, counsel. My name is Daniel J. Valker. I'm here on behalf of the appellants for the record, which is AF Holdings, LLC, Prenda Law, Inc., Paul Duffy, Paul Hansmeier, John Steele, and Brett Gibbs. Can I ask, counsel, can I ask, the record suggests that Prenda Law has now dissolved, is that correct? That's my sure what impact, if any, that has on appellate standing here. I mean, is that the equivalent of a natural person dying during the pendency of an appeal? Well, I don't think it has any impact at all. I mean, the entity, although it's dissolved, I think still, I mean, it's been named and it's still defending itself, even though it's, you know, no longer, it's winding up. Well, the other concern I had was that in reviewing the district court docket sheet, mail is being returned as deliverable as to virtually all of your individual named clients. Is there some reason why they haven't kept the court current on their current addresses? I don't know that. I mean, I am their current appellate counsel, your honor, and I have, I'm on the system, so I've been getting notices and filing documents and receiving notice of documents, but I have no idea why they are or not reachable. Well, are you in contact with them? I am. Okay, so you know how to get a hold of them. Absolutely. So we're here today asking your honors to reverse the $250,000 approximate sanction. Sanctions were entered against the appellants, including individual plaintiffs, the attorneys, and to reverse the case and to dismiss it. In the alternative, we're asking this court to remand the case back to the to the process that was employed by the district court in awarding the sanctions in the first place. This case arises out of a series of copyright infringement cases that were voluntarily dismissed due to the inability of the plaintiffs to identify the precise infringer. After these cases were dismissed, there was a sua sponte order entered by Judge Wright in the Central District asking Mr. Gibbs, who is the current sole counsel in these five cases, to show cause why sanctions shouldn't be entered. And then over a series of, before I get ahead of myself here, in the show cause order there was a, in the process, there was a statement by the district judge that he would consider incarceration as a, as one of the sanctions in this case. As a result of the incarceration of threat by the district court, this proceeding became a proceeding for indirect criminal contempt, which I'm sure as the court is aware, under United States Supreme Court precedent, as well as... Let's begin at the beginning. The first issue, as I understood it from your briefing, was whether or not the Duffy, Hansmeier, and Steele as the principles of Prenda law as a result of the fact that they controlled the litigation. But what is your response to the factual record that was before the district court on which it based that ruling? Because I think we have to find that factual finding to be clearly erroneous before we can grant you relief on whether or not he could even hail them into court for some of the things that were going on at the outset of the litigation. Ultimately, your honor, they did appear in court. So they did appear in court on April 2nd of 2013. I understand that, but the question is, as I thought you were, one of the issues that you raised was that the district court had acted beyond its authority to even impose sanctions because they were not parties to the litigation. Well that's true, they were not, they were not, but that's a factual issue and frankly the critical issue here is whether or not, due to the fact there's no question, this was an indirect criminal proceeding, contempt proceeding. Now before we get to whether or not it was criminal or civil, I just want to figure out whether the district court had the authority to take any action at all with regard to some of your clients. And do you agree with me that we would have to find that the district court's factual findings were in fact manipulating, not manipulating, controlling, making the decisions with regard to the prosecution of the civil suits and therefore they were the real parties in interest, which was his legal conclusion? I don't agree with that, your honor, because the proceeding was tainted, first of all. The entire proceeding was tainted because the procedural due process requirements were not followed. For example, at the April 2nd hearing, Mark Lutz was present in court. Mark Lutz is the CEO of the parties, AF Holdings and Ingenuity 13. He was there to testify that none of the individual attorneys, Mr. Duffy Hansmeier or Steele, none of them had any ownership interest or financial interest in the plaintiffs. Judge Wright refused to let them testify. I thought Mr. Gibbs testified that it was Mr. Hansmeier and Mr. Steele who were directing all of his activities as local counsel in California. He did testify of something like that, but that doesn't go to the issue whether there was a real party in interest. I read his testimony, that's what he said. I understand, your honor, that doesn't go to whether they are real parties in interest under the tests established by the Supreme Court and by the Ninth Circuit. They have to have some ownership interest in the plaintiff in order to be subjected to the court's inherent sanction power. Right, but then we have Mr. Lutz who is the designated 30B6 custodian and he didn't know anything. That's not true, your honor. He wasn't allowed to testify. He was in court April 2nd. He couldn't explain, for example, how Ingenuity or the other entity even came into being. He wasn't allowed to testify, your honor. He was denied the right to testify on April 2nd. So he didn't testify to anything because Judge Wright... Was his deposition taken at some point in litigation? No, your honor. His deposition was not taken by now. I mean, are you telling us that this whole program, and you were involved in it too, I understand. Me? I was not involved. Was it legitimate? An honest program? What program, your honor? This whole thing that went on. Well, I'm not involved. I'm their appellate counsel, so I don't... I can't speak to what they did or didn't do. All I can tell you, your honor, is that from the record... You don't know anything about the background of this case? Is that what you're telling me? I understand what the claims were that were brought by the plaintiffs in the underlying district court cases in California. Yes. I do understand what the claims... I do understand the claims were voluntary. Who's paying you? The appellants. Appellants? The appellants are paying me, correct. And the appellants are... Can you name them? I can name... I mean, they're all named on the... Yeah, of course. Yeah. Ingenuity 13 LLC, AF Holdings LLC, Parental Law, Inc., Paul Duffy, Paul Hansmeier, and John Steele. Who within that group is writing the checks, I really don't... And how that money's being divided between them, I really don't know. But in this case, your honor, I think you raise a good point there. On April 2nd, Mr. Lutz is not allowed to testify. As soon as the individual plaintiffs, the attorneys, asserted the Fifth Amendment, the judge stopped the proceedings and didn't allow Mr. Lutz to testify. In fact, that's a violation. I mean, once they... The judge cannot take the fact they asserted the Fifth Amendment and use it against them. Sure he can. He can draw adverse inferences from the fact that they've invoked the Fifth Amendment. There's a Supreme Court case that's running on that. He can't because it's a criminal contempt proceeding, your honor. No, no. I'm talking about using adverse inferences in a civil proceeding. This wasn't a civil proceeding. Well, we're not there yet. We're still trying to figure out the preliminaries here because as I understand it, what the district court initially looked at, the initial order to show cause in this case, was issued for what the district court thought was disobedience of its order preventing early discovery. It had entered an order saying, I'm quashing the Rule 45 subpoenas to the ISPs. They are not to comply with them. Apparently, the district court received information that they were, in fact, still being served or no notice had been given to the ISPs of the district court's order, and a hearing was convened to determine whether or not there were discovery disputes. There were discovery violations going on in disobedience to the court's order. Have I got that right? That's correct, your honor. Okay. So that was the first OSC that issued. But he threatened incarceration as a sanction for that conduct. Once the district court threatens a sanction of incarceration. But I thought the first thing the district court did was to schedule a hearing so that we could find out what cause there might be, if the defendants had any, to explain why they weren't complying with the court's discovery ruling. He did, but he threatened incarceration, and then he threatened incarceration again. Well, the first thing he did was to hold an evidentiary hearing, didn't he? Well, but once he threatens incarceration under the legal precedent, your honor, it becomes an indirect criminal contempt proceeding, which requires there to be an independent and impartial prosecutor appointed. In this case, counsel for the defendants acted as the prosecutor. That's a violation the U.S. Supreme Court has found. You keep wanting to go to the end, and I'm still trying to do this one step at a time. And the first step was the district court was trying to gather facts. Is there or is there not misbehavior going on here with regard to orders that I have entered directing no more early discovery? I understand that. I agree with that. And that was the first hearing that was scheduled. And as I read the record, that hearing had to be continued because your clients didn't appear for the first hearing.  That's right, but there was nobody to, in essence, show cause why in response to the district court's order. Isn't that right? I respectfully disagree. The attorney was there. Well, the attorney can't testify. The district court wanted to get facts, and lawyers are not fact witnesses. The attorney was not allowed to cross-examine, your honor, the witnesses presented by the defense. That's also a due process violation as well. Are we talking about the hearing at which Mr. Gibbs ended up testifying? Mr. Gibbs did testify. And he was cross-examined. Not by the attorney who was there representing the individual plaintiffs, the individual defendants, the appellants, Duffy, Hansmeier, and Steele. Judge Scheck told her to sit down, in fact, and did not allow her to cross-examine any witnesses. Because they had not appeared, right, in response to the court's order. The court was told they were available by telephone, your honor. Well, but the court had ordered them to appear. On the 5th of March. Right. This is the 11th of March. And then the hearing date got continued six days. Right. And they didn't appear. There was a March 11th hearing and an April 2nd hearing, your honor. Right, and they finally appeared in April, right? They appeared in April. Right, but they didn't appear on the second scheduled hearing. And all they did was they sent a lawyer who said, my clients are not here. There was no second scheduled hearing. My understanding is there were two hearings, two evidentiary hearings. One was a hearing set for March 5th and then a hearing set for March 11th and then a hearing set in April, right? March 11th and March 11th and April 2nd. Those were the two hearings. And neither hearing were due process requirements imposed by the district court. The district court allowed the attorney for the defendant, John Doe, to act as the prosecutor. Let me ask you this. Explain to me in simple English how this operation worked. You say operation? I'm not sure. Operation, from the beginning. From the beginning. Operation meaning the companies, how they operate? How the companies operate, yeah. Yeah, how they make their money. As I understand, the company, Ingenuity 13, owned an adult film. AF Holdings owned an adult film. Yeah, who bought that adult film? I don't know, Your Honor. The companies bought the adult films. They were owned, as I understand, by the companies. Who ran this operation? I don't know. You don't know anything, do you? I know Mr. Lutz was the CEO of the company, and he tried to testify, and Judge Wright would not allow him to testify. As soon as he found out that the attorneys were asserting the Fifth Amendment, he told them he was terminating the proceeding. They should have asserted the Fifth Amendment because they were engaged in extortion. They sent out thousands of extortionate letters. The Supreme Court does not allow courts to take the position that because somebody asserts the Fifth, they've done anything wrong. That's the basis of the Fifth Amendment to the United States Constitution. That inference is not allowed to be made. I think, counsel, you're really swimming uphill when you try to persuade us that the district court's findings of bad faith litigation tactics aren't well-supported in the record. You know, what the district court found was that the principles of PREMDA set up these companies that then owned the copyright to the movies and would then pursue John Jones through the downloads and tried to seek early discovery in order to extort a settlement out of them. I think those findings are pretty well-supported in the record. The way these companies operate, you know, it's not exactly a clean operation that was going on here. So I think you have a tough argument there. The question for me is not whether the court was within its inherent authority to impose sanctions. The question really is the punitive multiplier, whether we have to look at the sanctions in total and then consider whether a remand for the court to give the procedural protections due for criminal sanctions again and have them go through a hearing again, or whether we can say, well, the portion of the sanctions that is compensatory, that covers the opposing parties' attorney fees and costs, that is civil in nature, and I think that's well within the district court's inherent authority given the factual findings that were made, which, as Justice Helman points out, we have to review those for clear error. So I think you're having a tough time if you keep going back to the facts and trying to persuade us that they're not well-supported. Do you want to spend a little bit of time addressing the punitive multiplier and how we should handle that portion of the sanctions imposed? Your Honor, just so we're clear, number one, there was nothing in the record before the district court at the time the district court rendered its sanction decision about any extortionate tactics on the part of the appellants. That's just to say the record. Number two is I am not arguing the facts. What I'm arguing is that the process was tainted, that because the district court did not impose due process requirements that are required by both Supreme Court precedent and Ninth Circuit precedent, in the event the district court's engaged in an indirect— Those due process protections don't have to be given if the sanctions are civil in nature. In the Supreme Court, I said we look at the nature of the sanctions in determining that. So what I'm asking you is given the portion of the sanctions that covers the opposing party's attorney's fees and costs, which essentially is civil in nature, that takes care of the due process protections that you're complaining about, what about the punitive multiplier? I would like to deal with that, Your Honor, but I want to make the point that the issue of whether it's criminal or civil is not looking— to decide the nature of the time. Since the judge threatened incarceration, it became an indirect criminal proceeding, regardless of whether you awarded it or not. Let's say you're right about that. You want us to send this back and have it turn into a criminal contempt? Is that what you want? At an absolute minimum— Is that what you want? Absolutely, Your Honor. My clients want their day in court, and they want their day in court with the procedural protections that they're guaranteed under the Constitution. And a potential penalty of up to life imprisonment for violation of the criminal contempt statute. Is that what you want? They want their day in court, Your Honor. Even if they're looking at a potential of life in prison? They want their day in court. That's all I can tell you. This is why I'm here. They're willing to run that gauntlet? They don't believe they've done anything wrong, of course. They want their day in court. Then why did they go out of business so quickly? I have no idea, Your Honor. Why did one of them brag making $15 million or whatever it was? I have no idea. You know, that's in the record. It's not in the record before the district judge. It's in the record later. What's your explanation with regard to the fraudulent document that the district court found was presented to it? They purported assignment of the copyright to one of these entities signed by Alan Cooper. One witness, Alan Cooper, testified that the acceptance of the assignment was not his signature. Right. That doesn't mean that there's no evidence in the record that any of the lawyers had any knowledge of that or participated in that. Well, I thought Mr. Cooper was the gardener for one of your clients. Your Honor, there's nothing in the record regarding their knowledge of that forgery. Counsel, would you answer my question? Wasn't Mr. Cooper the gardener of one of your clients? Your Honor, I really don't know for sure. Come on, Mr. Volker. I'm not making this stuff up. I read it in the record. That's where my questions come from. He read it in the record. It was not before the district judge when he rendered his decision. So the answer is yes, there is in the record a reference to the fact that Mr. Cooper was the gardener for, was it Mr. Hansmeier? Your Honor, we ignored the record that was presented after the district. You're not helping me with this argument. Instead of answering my questions, you just want to bob and weave. And you've got 46 more seconds. Be my guest, if that's how you decide. I'm not going to speculate, Your Honor, on who Mr. Cooper is or isn't. I don't know him. But didn't Mr. Cooper show up in Judge Wright's courtroom? Didn't he have a lawyer? I believe he did. Yeah, and he said, that's not my signature. Yes, sir. Right, that was a forgery. But he didn't say that one of the appellants forged it, nor did he say that, nor could he prove they had any knowledge of the forgery. So the document just sort of found its way before the district court? It was delivered by the tooth fairy? It was a sui sponte sanctions order. I don't know what Judge Wright had or didn't have. He had a fraudulent document. I don't know how he would have. The witness has said, that's not my signature. I didn't authorize my name to be put on that purported assignment of copyright. I just don't know what he had before him when he issued the sui sponte order. It wasn't prompted by a filing by the defendant. I'm just amazed, counsel, that you're asking that we consider vacating the sanctions and sending it back for an independent prosecutor to be appointed and essentially for a criminal-like investigation to ensue given the findings made by Judge Wright in the Central District of California as well as other findings in other cases across the country. You know, all of that is fair game. I'm giving you my clients' direction. They would like their day in court. I'm a mere messenger in that regard. It's their decision. They're citizens of the United States, and that's what they would like. Well, they're looking for – that's what they like. Now, this was a very clever scheme that they were involved in. Someone goes out and they buy a copyright to a pornographic film. They buy several copyrights, and then they see them in the Internet, and then they find that there's thousands of computers that are moving in there and watching the program without paying a fee. And then they have someone that's associated with them who is a computer genius, I suppose, who then gets all the ID numbers or whatever, the IP numbers, and then comes into court and asks for discovery. And then that request for discovery is granted. And then they contact companies like Verizon and some of the others, and they get the names of these people. Well, at least they get the name of the subscriber. They get the address. And they send out these letters telling the recipient, Dear so-and-so, Steele Hansmeier has been retained by AAF Holding LLC to pursue legal action against people who illegally downloaded their copyrighted content. Digital pirates. Digital piracy is a very serious problem for adult content producers, such as our client, who depend on revenues to sustain their businesses and pay their employees. On May 2011, it's all blocked out, our agents observed the IP address with which you are associated illegally downloading and sharing with others via the BitTorrent protocol. It took me, because I've got smart law clerks, to figure out what BitTorrent is. The following copyrighted file. This is the copyrighted file. Sexual Obsession. The ISP, the Internet Service Provider, you are connected to Comcast Cable Communications. Your IP address you were assigned during your illegal activity. We have received a subpoena return from your ISP confirming that you are indeed the person that was associated with the IP address that was performing the illegal downloading of our client's content listed above. On July 7th, we filed a lawsuit in the federal court in the Northern District of California. Under the federal rules of civil procedure, our lawsuit against you personally will not commence until we serve you with a complaint, which we are prepared to do if settlement efforts fail. While it's too late to undo the illegal file sharing associated with your IP address, we have prepared an offer to enable our client to recover damages for the harm caused by illegal downloading and to allow both parties to avoid the expense of a lawsuit. And then they go on and talk that owners can recover $150,000 statutory damages. And another case where $20,000 per pirate file. And it goes on. And then they talk about more recently, on December 22nd, 2010, a case in which a defendant was accused of illegally downloading six works via BitTorrent. A settlement was reached for $250,000. And then they make them an offer in exchange for a comprehensive release of all legal claims in this matter, which will enable you to avoid becoming a named defendant in our lawsuit. Our firm is authorized to accept the sum, the $3,400, in full settlement of the claims. Offer will expire. It's the 24th, 2011, at 4 p.m. CST. If you reject our offers, we expect to serve you with a complaint to commence litigation. And they tell them, make your checks money order payable to steal Hansmeier. So they have that. Or you can fax it in, or whatever. Be sure to reference your case number and your REF number, your method of payment. Goes on. And then they offer this release that they'll send back. So here they are. They write to this person who they've identified, and they tell them, yeah, somebody in your household was looking at these, this porno, and they describe it. And they tell them your conduct was illegal. And it's got to scare the hell out of somebody that sees that. And then they offer them, you know, you can settle this for 40, whatever it was. $4,000. And then we have evidence that some of them are making, one of them bragged about making $15 billion for one of your clients. You know. I mean, that is just an ingenious, crooked, extortionate operation. You know, do you ever hear of the equity funding fraud? I don't believe so. Supposed to be, this was in 72. And I handled it, huh? It was the biggest fraud perpetrated on the stock market. And it was touted as a computer fraud. Computers came out then, huh? It's all in the Wall Street Journal, all over about computer fraud. But you know, you know what the computer was? It was a pencil. If a company made $1 billion, for example, they just put a little horizontal line on top of it, one. So now it's seven, see? That's the big computer fraud. This is absolutely all the things they took advantage of. They used our court system for illegal purposes to extort money. They used our discovery system. They used the internet. They bought these pornographic films and then seeded the internet with them. People were getting curious about them. So they brought in all the diagrams of it. This has got to be written about for years and years. You're probably going to be part of the story, and they all will be. I don't know where this is going to end up. If they really want to have a trial on this, with all the detections of a criminal case, the burden of proof, and a prosecutor, and all the rest of it, are you sure they want that? Absolutely, they want a trial. Is that what you want? What I want is irrelevant. I'm just an appellate attorney. You may be involved in this. I'm sorry, Your Honor? You may be involved in this. I don't believe so, Your Honor, in all due respect. I'm just the attorney. I'm just the appellate attorney. I know. And you're a great lawyer, too. That's what your ad says. We go on the internet, right? I wonder how many super lawyers there are in this country. There are a lot of them. A lot of them. And a lot of them is BS. I'm not going to disagree with you, Your Honor. Yeah. Yeah, it's a good way to promote your law firm. It's a good way for these publications to make a lot of money. And you put your ads in, and you get good photographers, and all the rest of it. Well, a good photographer wouldn't help me, Your Honor, so. I know. Let's turn this. Jim, let me get your profile. Yeah, hell, yeah. Hell, I'll hire you. And I don't know. This is just, I just never. Just when you think you've seen it all. That's when I think I've seen it all. And where do they have these companies they incorporate? Where do they incorporate them? I believe the record states that the A.F. Holdings and Injunuta 13 are incorporated in St. Kitts. Thank you. Nevis. Nevis. Nevis slash St. Kitts. They're two islands very close to each other. Do you know what famous American was born in Nevis? No, I don't, Your Honor. You don't have any idea, do you? I don't know. The guy that's brought us our banking system, our capitalistic system, who's responsible for our greatness today, our business, our industry. You know who that was? Your Honor, there's so many people. I'm sorry. No, no, no, no, no. And he was like a son to George Washington. Huh? That narrows the field. But I just don't. My history's not that good. His name was Alexander Hamilton. I recognize that name. Did you know that? Yes, sir. You knew he was born on Nevis? No, I didn't. I know who he is or who he was. Yeah, OK. Well, I thought you said you knew him. You didn't know him. No, I could not. I do not know him. You didn't know him personally. No, I swear to God. I do not know him personally. So, I mean, that bothered me a lot when I saw the birthplace of Alexander Hamilton defiled. But nobody knew that but me, I suppose, and a lot of other people. Get his biography and read it. And anyway, all right. Any other, anything else? No, no further questions. Thank you, Your Honors. All right, go on. You forgot to comb your hair this morning. It's about as combed as it'll get. Good morning, Your Honors. Morgan Peets for the appellee, John Doe. Not to put too fine a point on it, but what happened here is the reason many people... We used to say don't put too fine a point on it. Well, that I couldn't say. I did know that Alexander Hamilton was born in Nevis. That's why he couldn't be president, right? That was Dickens. Not to put too fine a point on it. Well, with Dickensian reference included, what happened here is the reason why many people hate lawyers. The word was used at one point, a disgrace to the profession, and it's something that I take seriously. And it's why I'm here, and it's why I was involved in the case below, and why I'm still here defending it on appeal, despite uncertain prospects that my time, at least on appeal, would be compensated. Well, you've got two bonds at the moment. Well, that's helpful. You're doing pretty good right now. That I wouldn't argue with, Your Honor. Before I move into the heart of my argument, and I can come back to the bond issue, I'd like to very quickly address a couple of points which were raised in the opening argument. The first is about this notion that Mark Lutz was there, ready to testify. Mark Lutz being the paralegal, and I'll note that it was in the record before the district court issued sanctions that Lutz was a paralegal for Steele Hansmeier. This notion that Mr. Lutz, in the mere span of a few years, went from a humble paralegal at Prenda Law to the mastermind overseeing a series of shell companies and overseeing the work of 20 lawyers across the country just doesn't hold water. It doesn't at all. And the notion that Mr. Lutz was there at the second evidentiary hearing, willing to testify, I think is belied by subsequent events. Well, but before you get to the subsequent events, did the district court, in essence, find that though he had been designated as the Rule 30b-6 custodian, he was, in effect, not competent to testify as a 30b-6 custodian because he didn't know anything? I think, Your Honor, maybe conflating two different people. So it was Mr. Hansmeier, the attorney, who testified as a 30b-6 deponent in the Northern District of California. But his deposition transcript, you lodged that in the record here at some point, did you not? That's correct, and the district court reviewed it prior to the first evidentiary hearing. So Judge Wright was referring to Hansmeier as the 30b-6 custodian who wouldn't answer any of the questions that a 30b-6 custodian should be prepared to answer. That's correct. And Hansmeier's story, part of it anyway, was that to the extent there was anybody associated with these shell companies, it was Mr. Lutz. So, you know, their story was, you know, to the extent that there's any person associated with these entities, well, at least one of their stories, was that it was Mr. Lutz. So now, they've argued on appeal and in the reply that while they were denied a fair opportunity because Mr. Lutz was prepared to take the stand there at the second evidentiary hearing, but that's belied by subsequent events. Twice, after the evidentiary hearing in this court, once Mr. Lutz was ordered to appear at an evidentiary hearing in the Northern District of California, that was AF Holdings v. Nevaska, Northern District of California 12CV-2396, and at ECF number 108 in that record, 9-15-13, Mr. Lutz didn't show up at the evidentiary hearing despite being ordered to do so. Similarly, in a different case, AF Holdings v. Battelle, Northern District of Georgia 12CV-262, ECF number 76, also on September 5th, 13. We're not taking, writing all this down. I'm sure it's being recorded, so I'll skip the references if Your Honor would like. But we have these things called gum sheets, you know, so you write it all down, you give it, where?  There she is. I'll be sure to lodge the references, Your Honor, before I leave. So my point is, so that was a deposition, and he no-called, no-showed at the deposition, meaning Mr. Lutz. So, furthermore, what the district judge asked at the second evidentiary hearing was whether anybody was prepared to present evidence. Nobody spoke up. They said that there was some argument they'd like to offer, but nobody, it wasn't like Mr. Lutz stood up pro se and said, well, I'd like to testify, Your Honor, I can explain all this. So I think that the Lutz was there, but he was denied a testifier argument is really belied by subsequent events. On jurisdiction, which the court touched on, in addition to the question of whether or not the lawyers were really the real parties in interest, it's undisputed in the record that they were served with an order commanding them to appear in an evidentiary hearing and that they did, in fact, appear. So jurisdiction of the court was also established by service of a subpoena, essentially a command to appear before the court. I thought they specially appeared. No, they specially appeared at the first hearing. Then they were subsequently reserved with the order commanding them all to appear a second time. I thought you could not make a special appearance in a federal court. That was also my understanding, Your Honor. Notwithstanding that fact, many people try, nonetheless. But I think the point is that after the first hearing, Judge Wright ordered Gibbs's counsel to serve them all with the new order commanding them to appear at the second hearing. That's what happened at the Chicago 7 trial. You know, some... Mike Tiger appeared especially, but Julius the Just had him arrested in California. So I'll have to take your word for it, Honor. I know very little about the Chicago 7. Well, really. I once worked with a lawyer who was involved with it, but that's a story for another day. Who was that? John Lowe was his name. Lowe? Lowe, a lawyer in Maryland. So I think at this point, though, I'd like to discuss really what I see as the main issues here on appeal. And I really have three points in terms of what I think the crucial appellate issues are. First, I'd like to discuss Lockery, the case that's cited by the appellants. And first of all, explain why I think it should be distinguished. And secondly, and this is perhaps a more involved conversation, discuss why I don't think it's really good law anymore. And that's possibly a thornier issue. But let's assume for a moment that Lockery is good law. It could be distinguished on two bases. First of all, in Lockery, the public interest exception to the usual American rule that parties bear their own attorney's fees was not present. Here it is. There's some language we cited in the brief to the effect of when a court is essentially exercising, when issues are benefiting the public, when there's a public interest concern, the court's equitable powers are at their broadest. We have an issue here. We didn't have that kind of an issue in Lockery. Secondly, let's look very closely at what the actual holding of the Lockery court was. And I'm quoting now. Cooter and Gell suggests that the trial court should limit sanctions to the opposing party's more direct costs, that is, the cost of opposing the offending pleading or motion. We thus find that the district court erred in including the defendant's attorney's fees for preparing their motion for sanctions in the sanctions it imposed. So, in a sense, Lockery, which was an inherent authority sanctions case, was really sort of an 11B2 issue. It involved a law firm making a number of stretched to frivolous legal arguments. That's pretty fundamentally different from the kind of conduct that we have at issue here where, you know, to quote Chambers, what we have is a, quote, sorted scheme of deliberate misuse of the judicial system. I think that you could distinguish Lockery in terms of the type of conduct in addition to the public interest issue. Third, and perhaps most importantly, as to why Lockery should be distinguished, Lockery was decided prior to the 1993 amendments to Rule 11. This case, of course, is being decided after the 1993 amendments to Rule 11. This is where things get a bit complicated in terms of whether or not Lockery remains good law. The first thing I'll note, and this is a case that I did find over the weekend, is in 1997, the Third Circuit looked at this issue in In re Tutu Wells' contamination litigation. Why did you wait for the weekend? Well, I found it in response to some arguments that were raised in the reply that I reviewed. And as I can get back to later, this really fits into some recent activity before the Ninth Circuit where there's currently an en banc case that's set to be heard in June of this year that's looking at some similar issues in the bankruptcy context. So the Third Circuit, in 1997, said basically that it thought Lockery was, quote, unwise and that Lockery had misinterpreted Cooter and Gell. So that was 1997. In 1998, in Margolis v. Ryan, Margolis v. Ryan says, essentially, Lockery is no longer good law, period, full stop. Now, the case that's relied upon by the appellants in their brief is that, well, in 2010, the Ninth Circuit revisited this issue in Orange Blossom and the Orange Blossom court drew a distinction. It said the Orange Blossom court said, well, we're not so sure that the statement in Margolis v. Ryan that Lockery is no longer good law applies to the inherent authority context. I don't think, I see that as potentially problematic and here's why. The problem is that Lockery was an inherent authority sanctions case. Margolis v. Ryan was a Rule 11 case. If Margolis v. Ryan had meant to distinguish between inherent authority and Rule 11, it didn't need to discuss Lockery at all. So for the Orange Blossom panel to come in and say, well, we think Margolis v. Ryan meant to distinguish between Rule 11 and inherent authority, to me, doesn't make sense because if that's what they meant to do, they didn't need to talk about Lockery at all. I read Margolis v. Ryan as sort of unambiguously in light of supervening authority as indicated by the 1993 amendments, essentially saying Lockery is no longer good law, period. You may have something, counsel, in arguing that maybe Lockery shouldn't be in effect any longer or maybe we should take a look at it, but you're arguing before a three-judge panel and that's our precedent. As I read it, Lockery and Orange Blossom talk about direct costs in pursuit of a motion for sanctions, but in this case, it wasn't the defendants that really filed the motion for sanctions. This was a sua sponte, order to show costs, where the court was pursuing sanctions and inviting at multiple points counsel to assist the court or to weigh in on it. Do you see that as a factual distinction between Lockery and Orange Blossom that we can take a look at? Absolutely, Your Honor, I do. And on that notion of this is a three-judge panel, I certainly appreciate that. And my response to that would be I think it's arguable that Orange Blossom conflicts with Margolis v. Ryan. And based on my understanding of the way horizontal stare decisis works on the Ninth Circuit, this panel should look to Margolis v. Ryan, not to Orange Blossom, setting aside the issue of whether or not on bonk the whole court could revisit Lockery in a more comprehensive way. I thought you were here to make our lives simple. Well, Your Honor, I'm here to defend the district court's award is what I'm here to do. And I, you know, I sympathize. Judge Fischer, who wrote Orange Blossom, he's in the other courtroom. I understand that, Your Honor, I do. And, you know, what I'll note is that... You've got his conclusion, Roman numeral four. Is that what you're talking about there? So when you're referring to the Orange Blossom decision itself? Yeah. Right, so the part that discusses inherent authority sanctions, right. Well, but he sums it up at the end. Right, you're talking now at the end of the Lockery decision? You got a deck of cards there? I do. One of them says Lockery on it. Well, so I think my point, though, and I would note now that this is sort of running in parallel to a situation that's going on in the bankruptcy context with respect to Sternberg, and I'm blanking on the name of the case, Schwartz-Tallard, which has currently been accepted for on-bonk review. There's a very similar issue that's currently pending before this court with respect to the bankruptcy code, and it's very similar. There's a precedent from some years ago which suggests that maybe fees on fees aren't okay. If you look at the conclusion... This is Sunbelt. The bankruptcy court properly awarded costs, attorneys' fees and punitive damages against the 13 petitioning creditors. Those are the folks that brought the involuntary petition. So I think the more troublesome part of the Lockery opinion is the inherent authority part, so I would agree with that part of it. Yeah, that's fine. I feel better hearing you say that. Okay, the bankruptcy court properly held Kramer and Tedder jointly and severally liable for the fees and costs SC, SD, and IVT incurred to obtain dismissal of the involuntary petitions, but erroneously held Kramer and Tedder jointly and severally liable for the fees and costs SC, SD, and IVT incurred to litigate the post-dismissal motions. Right. All right, so what's the consequence? Well, so that's my point, is that Lockery can both be distinguished and there's some question about whether it remains good law would be my response to that point. The troublesome part of that is really the end part, which deals with inherent authority sanctions. I hope that answers... Therefore, affirm in part and vacate in part the order of the district court affirming the opinion of the bankruptcy court. We remand to the district court with instructions to remand to the bankruptcy court to amend the judgments against Kramer and Tedder accordingly. And so the consequence of that is what? Well, I think that one could certainly read that as saying that it suggests that fees on sanctions were not allowed in that case. So one could analogize that maybe it means fees on sanctions shouldn't be allowed here. But my point is that it should be distinguished for the reasons that I mentioned in addition to the one that Judge Nguyen added. And in addition, there's a question about whether Lockery, as now arguably interpreted by two conflicting panels, remains good law. I think I would be remiss if I didn't speak very briefly at least about In re De Vil and the issue of the punitive multiplier, so to speak. So there's one issue of fees on sanctions and the other issue is with respect to the punitive multiplier. What I am asking the court to do is to build on the distinction that's noted at the very end of the De Vil opinion in footnote 9. And I'd really try to focus the court's attention on that. And I would ask, you know, what was the court doing in footnote 9 at the end of the De Vil opinion? First of all, the court was distinguishing Mackler Productions. Mackler has the dubious distinction of having gone up on appeal to the Second Circuit three different times. On the third time it was at the Court of Appeal, the court noted, and it was clearly sympathizing with a 78-year-old attorney who'd never been sanctioned since, that in our view to impose additional sanctions on him would therefore serve no useful retributive or deterrent purpose. What the Ninth Circuit panel seemed to be doing at the end of De Vil is drawing a distinction between Mackler, where deterrence wasn't an issue, and De Vil, or indeed this case, where deterrence is absolutely an issue. The second thing that the court in De Vil with that footnote was making clear was that its prior discussion earlier in the opinion where it says something to the effect of if the sanctions had been issued under inherent authority, then the argument that criminal due process would have been required might have some merit. What footnote 9 is doing is making clear that that's a dicta. That's a dicta of the court. It's not the holding, and that issue wasn't before the Ninth Circuit in In re De Vil because the way the Ninth Circuit resolved the issue is they said, well, the bankruptcy appellate panel ordered that this be remanded so that the issue can be assessed under the bankruptcy version of Rule 11. The Ninth Circuit affirmed that result. The comments about, well, if this was really an inherent authority case, whether or not criminal due process would be required, that's a dicta. And footnote 9, I think, makes that clear. Counsel, the problem I'm having, though, and I think Judge Nguyen touched on this earlier with one of her questions, is that we have a number of cases that tell us in order to determine whether a sanction is civil or criminal in nature, we look at the consequences of whatever it is that the district court has ordered. And the problem with a punitive sanction is that it is payable to the court, and it is, in essence, in the nature of a fine. It's not coercive as it is in a civil discovery dispute where you're imposing $25,000 a day on a party because they're not complying with a discovery order. And while I can understand the argument you're making  that you incurred in having to, in essence, litigate this entire sanctions matter, I'm troubled by the district court's characterization when it doubled that amount and called it punitive. And in that respect, I think Mr. Volcker may be onto something when he says that the district court, if it didn't step over the line into the criminal arena, it sure came awfully close to the line. And if we conclude he stepped over the line, then don't we have to send it back for the full panoply of due process protections that would otherwise be afforded a criminal defendant? To answer your question, Your Honor, a few things. It's going to be a somewhat complicated answer. It's a tough issue. It is. It is very much a tough issue. The first thing I would say to this is with respect to the label applied, there's clear law that this court isn't bound by the label. That being said, I would note that in the sanctions order, the district court clearly wrestles with the issue of it wants to do something that's deterrent. It talks about deterrence and feels as if it can't issue a deterrent sanction. It's undisputed, and in every sanctions situation you look at, the fundamental concern of civil sanctions is supposed to be deterrence. It says that in the advisory committee notes deterrence or coercion. Well, so it's clear in the case law that there's compensation and coercion, right? But my point is that all of the cases addressing even inherent authority sanctions go back to this notion of the importance of deterrence. Now, what's basically happened is that Bagwell, which is a contempt case, the standard discussed by the Supreme Court in Bagwell has pretty much been imported into the sanctions realm. As I argue in the brief, I think there's some good reasons to really explain why that's maybe not fully appropriate, certainly not in this case. First of all, there's a difference, I think, between a court saying, pay the court money for violating my order and pay the other side double attorney's fees because you defrauded the system. I think that that's a key distinction. Here's what Bagwell actually had to say, is that criminal procedural protections may be in order when contempts take on a punitive character, and then this is the key part, and are not justified by other considerations central to the contempt power. Necessity and deterrence are central to the contempt power. Public interest is central to the contempt power. The problem, though, the cases also draw a distinction between events occurring in the courtroom and events occurring outside the courtroom. There is no question that if counsel misbehaves in such a way that the decorum of the courtroom is being destroyed, the court could incarcerate the lawyer immediately, simply tell the marshal, take that man to jail in order to restore order. But here the district court was faced with conduct that was occurring in part before it with regard to the submission of fraudulent documents, with regard to the games the witnesses were playing and not answering questions on deposition and so on, and then activities that were occurring outside the courtroom, sort of getting back to Judge Pregerson's concern about the overall scheme and its impact on the public. And the question is, how do you fashion an appropriate remedy for that kind of misbehavior, which is a combination of in-court and out-of-court conduct, and when do you have to provide under the Constitution the due process protections that we otherwise afford a criminal defendant? And the best way to handle it in the real world is you have a hearing and you treat it as criminal contempt. You give them the full panoply. Well, so I think, you know... A lot of these things happen because... Well, because of all the atmosphere engendered in a courtroom. And... It's a power that ought to be used very sparingly. And... The judges have other ways of dealing with witness problems, with lawyer problems, that... can eliminate any need for really getting into the criminal contempt theory. So I'm being vague. Well, I think you're right. The inherent authority of the court is awesome, and it does need to be closely watched by the courts of appeals in particular. To come back to Judge Talman's question of how does one draw the line, how does one fashion a rule... Well, I'm just... My view would be that... If you're going to impose a sanction, you ought to have a hearing on it. If it happens in the courtroom... Then there are a lot of ways to handle it other than having the marshal come in and haul the lawyer off. And... Anyway, so if there's a doubt... Give them the full panoply. And I think that's fair. But I think the question that Judge Talman was trying to ask is, is where's the line, right? What's the limit? What's the limit of the court's civil... That's what they want. Because they're opening up a Pandora's box Well, I would argue that the court can do both. The court can award the maximum civil sanction in this appeal and also grant them their wish of an additional criminal proceeding on remand. If the court finds that the sanction here was civil, it can do that. The question is, what's the limit of the court's civil sanction power? And it seems to be a recurring problem where district courts, when confronted by a misconduct in civil cases, would like to address it without resort to a full-scale diversion into criminal due process. Capable of repetition yet evading review may as well describe Prenda's whole strategy. The problem is the existing rules aren't really up to the task. I mean, nobody's ever served in these cases for the most part, right? You know, there's never going to be an adversarial defendant who can come in and make a Rule 11 motion, right? I find it hard, and this is a weird construction of the way the rules work, is that can it really possibly be true that a district court's power to issue a significant deterrent sanction depends on whether or not there's a party who makes a motion prior to the bad actor filing a voluntary dismissal under Rule 41, right? Because the way these cases are set up to work, there's never going to be a defendant who can make the motion, right? They get their discovery, they're in, they're out. That's all they need from the court. They never serve anybody. So your argument is that the rules are written for lawyers and litigating parties who are invoking the system in good faith. They're not written for people who are gaming the system in the sense that they tried all kinds of things. They filed motions for sanctions against you. They tried to get the district judge disqualified. And as soon as all those efforts failed, they immediately dismissed the action in order to try to deprive the district court of the authority to do anything further. That's right, and so my point is this in sort of the broadest strokes, is that necessity is the mother of the rationale for inherent authority sanctions. If the district court concludes that it is necessary to issue a deterrent sanction, a civil deterrent sanction, then the court's inherent authority power ought to allow for that. Now what's the limit? What should the limit be of what a compensatory deterrent civil sanction could be? The court doesn't have to decide that issue in a final way with this appeal, but I think what this court could do is set the line at two ex-attorneys fees. And I think that we find a tremendous amount of support for that in the Lodestar case law, right? If the court can, without resort to criminal due process, double an attorney's fee award in Lodestar and multiplier world, right, why shouldn't a court be able to do the same thing as a deterrent sanction? Now that's not to say that the court's... Well, maybe it's semantics. I would be much more receptive to that argument had Judge Wright said... Not said. Yeah. Had he said, Mr. Pitts, I am going to award Lodestar here because you are a tenacious litigator and you appeared and defended these people who otherwise are never going to have a lawyer who is going to hang in there with them through all the antics that the plaintiffs are trying to get away with, and I'm going to reward you for that effort by giving you more than your hourly rate. I'm going to give you double your hourly rate as a Lodestar. And I wouldn't have any problem with that, but that's not what he said. He said, I'm going to give Mr. Pitts his hourly fees, but then as a punitive measure, I'm going to double them. And that's... I mean, it's not even clear to me whether the money's payable to you or to the court. I think it's payable to the court. Well, so the... The districts are $41,000. Well, the district judge's order made it clear that it's payable to John Doe and my law office, so that at least is clear from the record. Okay, so it is payable to you and not to the court. Correct. The punitive multiplier portion is payable to me and not to the court. The question about the punitive label being used, what I would point out is that the district judge clearly felt constrained because the Show Cause order was issued after the voluntary dismissal. The court couldn't award a deterrent sanction because the Show Cause... under Rule 11, because the Show Cause order came after the Rule 41 dismissal. The case was gone. The case was gone, that's right. And what the Rule 11 says is that if the court is going to issue that kind of an award to the court, a deterrent sanction to the court, then the Show Cause order, if it's coming sua sponte, then the Show Cause order has to be done prior to the voluntary dismissal. So I think, you know, and you see the district judge talking about it in the opinion is he felt like deterrence was important here, but he felt constrained. And, you know, he talks about the facts, but I think it could also be read as he was really constrained by the law. And I briefed this while the sanctions motion was pending. I said, look, there's some law which suggests that maybe Rule 11 is going to be the wrong vehicle to use here, right? I just find it hard to believe that a court doesn't have the authority to appropriately deter a civil litigant using only civil procedures, without a full-scale diversion into full criminal due process. If necessity, you know, these are what Judge Goodwin once called sort of hazardous waters. All of these issues about, you know, fees on fees or, you know, what's compensatory or what's punitive. I think that what district courts and litigants both are really in need of is a rule that practically speaking would be clear and it would say if somebody is litigating in bad faith, then it's clear they could potentially be liable for full fees for the entire action, multiplied times two. The court need not to decide if in other cases a higher award could be made, but if there was a clear rule that that was the limit of the court's power, I think it would eliminate a lot of work, particularly for this court, with respect to sanctions appeals. Well, we don't get many of these cases. Fortunately. Well, I'll note that sometimes when they do, at least with Mackler Productions, they seem to come up and down multiple times. So, you know, I see I'm way over my time. You are, but I want you to answer one question for me because the other side's brief questioned whether or not the Copyright Act, which does contemplate fee shifting for prevailing parties, even applies where there has been no resolution of the merits of the copyright claim. This is essentially a sideshow with regard to abusive discovery and other tactics that occurred in conjunction with the litigation, but we really never got to whether or not there was a legitimate copyright here. And I think this goes to sort of the follow-on appeal of the order-setting thought. Well, I think the key Supreme Court standard is has there been a material change in the status of the parties or something pretty close to that. Don't quote me on that part off the top of my head. But I would argue that practically speaking there has been here. Prenda, et cetera, is practically speaking prohibited from continuing with this case because if they do so, there's going to be an unclean hands defense and they're all probably going to be subject to criminal prosecution. So, you know, technically could they refile? Maybe. Practically speaking, no. I mean, I think that they were all referred to the U.S. Attorney's Office, they were referred to the IRS. I mean, this is totally outside the record, but has there been any action from the government in responding to the referrals? Well, I'll put it this way. I haven't heard about any directly, you know, and I'm not sure if the agencies are waiting to see what this court does first, which, of course, may be prudent. Right. So I don't know, you know, personally, I don't know. But so to come back to how the Copyright Act plays in, right? Because I would say first there's an argument that in fact my client is the prevailing party because practically speaking positions have changed. Secondly, and, you know, this is a point I touched on very briefly, you know, at the end of the brief is that, you know, I think it wouldn't be a bad thing and this is consistent with what the Supreme Court has recently done in the patent cases of perhaps tipping the pendulum under the Copyright Act of whether a voluntary dismissal without prejudice can nevertheless anoint a creating party. Tipping the pendulum back towards some of the Ninth Circuit's prior precedent pre-Buckhannon on this issue would be a good idea. I mean, it's not going to take long before there's, I mean, indeed they're already happening, before there's similar sort of copyright opportunistic business models, I think that... But I thought we have cases even in our circuit that say a voluntary dismissal without prejudice is not a resolution on the merits and therefore you can't do a prevailing party. So originally in copyright there was a Ninth Circuit case which said it could be. And then Buckhannon was announced and there was a decision which said, well, the Ninth Circuit decision saying a voluntary dismissal could nevertheless anoint a prevailing party is no longer good law after Buckhannon. The question would be, and it's sort of a very unique factual circumstance that's been presented here, whether that could be sort of swung back a little bit towards the Ninth Circuit's prior precedent on this issue on the facts of this case. The other point I would note about the appellate bond is that even if attorney's fees on appeal are not available by fee shifting under the Copyright Act, I would argue that there's a pretty significant portion of this appeal which was frivolous or sanctionable. To the extent that they were arguing that there were no facts in the record to support the alter ego or to support the idea that the lawyers essentially became their own clients but then failed to cite the relevant portions of the record in support of that argument. I mean, the reply is the first time they get into any of that evidence. To the extent that they've done that, they may well potentially be liable for attorney's fees on appeal under Appellate Rule 38, so the bond could nevertheless be left in place to potentially secure that. Without disclosing exactly a very nominal sum, Your Honor. But, you know, one question in this recent sort of bankruptcy issue is it means they got it from his client and not from the other side. Correct, correct. You know, the one thing that they talk about in this case that's now pending for en banc review before the Ninth Circuit is, you know, the lawyer there wasn't just appealing procedural issues. He was defending the propriety of the notion that misconduct had occurred. And that's sort of what I'm doing here and I felt like I had to, no matter what. Unless the Court has any other questions for me, I say I'm way over. Thank you very much. Thank you. Just briefly, counsel made mention of the fact that there's some subsequent evidence that Mark Lutz would not have testified when given the opportunity on April 2nd. He's referring to, I presume, something that has occurred since the district judge entered his order and under Ninth Circuit precedent would not be reachable. Let's put it that way. Number two is the way I look at this case, maybe from a more non-layman standpoint, is a district judge is threatening a number of parties with sanctions for, among other things, forgery. And he's threatening them for conduct that if there was a forgery, it would have occurred outside the courtroom. And there was no forgery, but just for the record. Well, it goes to one of the elements of your claim, does it not? In other words, in order to prevail on a copyright infringement claim, you have to show that the plaintiff is the bona fide owner of the copyright. Actually, you don't, Your Honor, because it was the acceptance of the assignment that was claimed to be forged. The acceptance of an assignment is utterly irrelevant under copyright law. Well, it depends on who's bringing the action. If it's the assignee who is bringing the action on the basis of the assignment, then why wouldn't it be fair game for the other side to question the propriety or bona fides of... I mean, it's a standing question, isn't it? Well, in this case, the assignee was Ingenuity 13. But in the case that he was claiming the forgery, that was a case where the copyright belonged to Ingenuity 13 from the beginning. It had never been assigned. So the assignment issue was completely and utterly irrelevant to what he was seeking to determine. But my point, I guess, is that the district judge is telling you you're being charged possibly with forgery. And it's for forgery that occurred outside the courtroom. And at that point in time says, I'm going to consider incarcerating you if I decide you've committed a sanction. He also then... When you assert the Fifth Amendment, he says, I'm going to use that against you. In his decision, he said he actually did use it against them. And they drew inferences of what they would have said had they testified against them. That is a scenario... He smelled a rat, didn't he? Well... That's what he did. I would just hope that if I were charged with a crime, I wouldn't be convicted based on what I smell like. I would prefer to be convicted based on the facts. No, he... I'm using that figuratively. But... He's there. He's got this case. And he's moving along with it. And then... The folks that filed those other cases... When they did, they should have called the clerk's office to the attention of the low-number rule. But there's another case that's in our court that they filed. It presents a similar issue. You're supposed to do that so we can assign all these matters to one judge. Well, they didn't do it. And... Somehow, it came to his attention or someone else's attention that here are these other cases. So he gets all... What was it, five of them together? That's correct, Your Honor. And he looks at them, and it's the same type of... operation going on. And... So he gets to thinking about it. Things don't look right. And... One thing leads to another. No other judge there was aware of... the fact that some other person, some other court in some other district, another district court judge had an almost identical case. That's... That's what happened here. He got on it. He started thinking about it. I understand your point, Your Honor. I just merely wanted to finish by... He's an old Marine Corps drill instructor. He's checking things out. And he hit on it. I understand. And he was right this time. Mr. Wright, Judge Wright was right. Yeah, Judge Wright was right. My only point I want to make... Judge Wright, you're always right. Let's hope not in these circumstances. That's just the story between us. He clerked for one of our dear judges, Gene Wright, up in Washington. I just want to conclude by saying that... You took his place, didn't you? I did. He took his place on the bench. Under those circumstances, if anyone was held with those circumstances of being charged by a district judge of potentially committing forgery, of being threatened with incarceration, that at that point the court would have to, under the United States Constitution, would have to put in place the safeguards, the criminal safeguards that we enjoy as... Could he have appointed a special prosecutor? I don't see why he couldn't, Your Honor. As long as he's impartial. That, I think, is a requirement, and there's case authority in our brief that that cannot be harmless error. That's what you do if you have criminal contact. Right. Appoint a special prosecutor. And that cannot be... The failure to do that cannot be harmless error under a Supreme Court precedent. Well, what we're dealing with... Right, so... And he did use the word punitive. So... You could send it back and... And hold a hearing that gives your client all of the protections that the criminal law provides. That's what we're asking for, Your Honor. That's what you want. Yes, sir. Sure you want... Absolutely, Your Honor. Well, as I was listening to the last few questions and answers, I was looking up Mr. Cooper's testimony, because you were mentioning the findings of forgery and reading Mr. Cooper's answer, that my name is being signed and forged and used for whatever these officers or myself personally scams that they have going on, and that Mr. Steele told me, if anybody contacts you about any of my law firm or anything that has to do with me, don't answer, just call me. And I suppose if we were to send it back on remand, all of those questions and answers regarding Mr. Steele's conduct would be something that the prosecutor would then have to look into. And then what you're asking for, Mr. Steele, one of your clients is asking for, is that the whole thing be aired out in a new and fuller, more comprehensive hearing into the misconduct that Judge Wright was so concerned about. Well, we're actually asking to dismiss, to vacate the order and dismiss the sanctions. Why shouldn't we just affirm the part of the order that is clearly civil in nature and then remand with regard to the more troublesome issue, the punitive award? That's a good question, Your Honor. The answer is relatively simple from our standpoint. That's because by portraying this as a criminal contempt proceeding, by threatening incarceration and by ultimately awarding punitive sanctions, that tainted the entire proceeding. It affected the head lawyers. They had notice. They were apprised as to the basis for the court's concern in the orders to show cause. They had a hearing, an opportunity to appear and show cause if any they had, why sanctions should not be imposed. And under any other circumstance, if it were purely civil in nature, they would have been afforded all of the process that the law says is due. Isn't that true? There could have been two separate hearings, one civil and one criminal, but that didn't happen. So why can't we uphold the civil portion and then send the other part back for a criminal proceeding? Because, Your Honor, they asserted the fifth based upon the fact they were being threatened with incarceration. They didn't testify. But they could assert the fifth in regard to the civil proceeding as well, could they not? I believe they could. Oh, why not? If you have a good faith basis to believe that a truthful answer to a question in a civil or administrative proceeding might incriminate you, you are entitled under the Constitution, as I understand it, to invoke your Fifth Amendment privilege. But if you do, the fact finder in the administrative or civil proceeding may draw an adverse inference from the fact that you did so. Isn't that the law? Well, that may be the law, Your Honor, but they were not presented with a civil proceeding, number one. They were presented with a criminal proceeding, number two. They were denied the right to call witnesses on April 2nd. They were denied the right to cross-examine witnesses. When Judge Wright learned they were asserting the fifth, he stopped the hearing and he said, I'm going to draw adverse inferences from your assertion of the fifth. I'm not letting Mr. Lutz testify. And that was the end of the story. So given that, you can't split the baby because they really were not given an opportunity to defend themselves properly. They weren't given the right to cross-examine witnesses, to call witnesses, to present Mr. Lutz. We can all speculate on what Mr. Lutz may or may not have said, but he wasn't allowed to testify. What evidence did they come to court prepared to present? What would their offer prove? Your Honor, I'm not a criminal defense attorney, so I can't tell you that. Well, but there is no proffer. The problem is the only thing we can tell from the record is that everybody took five. Well, Mr. Lutz would have testified that none of the individual defendants, the attorneys, had any ownership interest in AF Holdings or Ingenuity 13, for starters. Well, how does that square with the fact that the money went into their client trust accounts but never got transferred to any of these entities in the Caribbean? That's evidence that apparently the appellate court has because of the later filings after this appeal was filed. So you have the benefit of a record that wasn't before the district judge. But you're making representations as to what Mr. Lutz would have said, which contradicts other evidence that we have, and I don't see in the record any proffer as to what Mr. Lutz would have said. I don't believe there was a proffer. He wasn't allowed to testify. Well, but the court said... No, that doesn't stop. The court said you could file a brief, and counsel said, okay, I'll file a brief,  from Mr. Lutz or anybody else that she wanted to file. The judge refused to let Mr. Lutz testify because they asserted their... You're not listening. I read the transcript. The court said you can put it in a brief and submit whatever you want, and as I understand it, is it Rosling, Rosling, R-O-S-I-N-G, from San Diego, the lawyer who was your predecessor? I'm not sure. No, no, she was representing my predecessor, not the appellate. No, no, no, I'm talking about the lawyer who represented them at the hearing. Yeah, I've never met her. I don't know who she is. I don't know. I don't recall her name. Can I read her name in the record? I don't remember, Your Honor. I'm pretty sure I did. You could be correct. I just don't know. But, I mean, she filed a pleading, something after the hearing, at the court's suggestion. Procedural due process doesn't, in my view, doesn't work that way. You're given the right to defend yourself. You're not given little tidbits of ways... But she didn't file a proffer from Mr. Lutz is, I guess, the concern I have. Not that I'm aware of. Okay, all right. But I do know that we do state in our brief what he would have said, if you recall, to testify. Well, I read it in your brief, but I don't see it in the record. I understand. I wasn't involved in that part of the case. But under the circumstances, we're asking that you dismiss the case based on the fact that none of the individual defendants are real parties in interest. They never filed an appearance in the case. They weren't... The lawyers were not parties. They didn't file an appearance. Now we're going back to the question I asked you the first time you came to the podium, which is, what we have here are facts in the record, which we have to find are clearly erroneous before we can agree with you. And I guess your response to that is, well, yeah, but the whole proceeding was changed. Absolutely. There was no due process. We're just arguing round and round. That's our view, Your Honor. I'm sorry. We hear your position. Thank you so much. All right. That's it. And we'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Tallman, Nguyen